# Mary J. Drexel Home Petition

*Samuel H. High, Jr.,* and *Howard R. Detweiler,* for petitioners.

*Federico F. Mauck, Anthony H. Whitaker* and *Don B. Blenko,* for claimant.

TAXIS, P. J., July 19, 1957.—Mary J. Drexel Home and Philadelphia Motherhouse of Deaconesses (hereafter called Drexel Home) on March 16, 1956, filed its petition asking for authorization to transfer to its general account two funds which are described as (1) Children's Hospital Fund, and (2) The Free Bed Fund by application of the doctrine of cy pres "In accordance with the provisions of the Act of 1855, P. L. 328, as amended, and the Act of 1947, P. L. 100".

The record establishes that the Free Bed Fund amounts to $105,293.75, plus accrued income, and the Children's Hospital Fund amounts to $9,878.22, plus accrued income. From their inception, both of these funds have been segregated from the general assets of the Drexel Home and have been kept in separate accounts. Hearing on the petition was set by the court for April 25, 1956, and public notice of the hearing to all claimants was ordered by preliminary decree dated March 16, 1956.

On April 25, 1956, the hearing date, two claimants appeared, viz: (1) the Drexel Home, and (2) the Lankenau Hospital, each claiming the funds. A full hearing was held.

Oral argument and written briefs on the merits were submitted. After extensive deliberation, serious doubts were raised in the court's mind on the question of jurisdiction and venue of the subject matter, and on March 27, 1957, counsel for both petitioner and respondent were requested to submit written briefs on the subject. Subsequently, oral argument was scheduled for June 18, 1957, at which time counsel presented their views and submitted briefs.

At the hearing on April 25, 1956, an answer to the petition of the Drexel Home was filed by the Lankenau Hospital, admitting all the material averments, but by way of new matter respondent "asked the court to award the funds to the Lankenau Hospital" . . . "in view of the historical background, the intimate identification of hospital and petitioner, and the intimate identification of the Children's Hospital, formerly operated by the petitioner with hospital".

From the petition, answer, new matter and the evidence, both oral and documentary, the following facts appear:

Drexel Home was incorporated on December 12, 1887, for the establishment, maintenance and management of (1) a home for aged couples of German birth or descent, and (2) of a motherhouse for the maintenance, religious instruction and education of deaconesses, who shall become members of the Lutheran Church. On April 29, 1893, the charter of the Drexel Home was amended to empower it to maintain and manage a hospital for children and a high school for girls.

From the date of incorporation until November 17, 1953, Drexel Home conducted its corporate affairs at 2100 South College Avenue, Philadelphia, and from December 16, 1893, until August 15, 1952, it maintained and operated a hospital for children at that address. On August 15, 1952, Drexel Home discontinued the operation of the Children's Hospital, and on November 17, 1953, moved from 2100 South College Avenue, Philadelphia, and conducted its remaining corporate affairs at 801 Merion Square Road, Gladwyne, Montgomery County, and 238 Belmont Avenue, Bala-Cynwyd, Montgomery County. The Home for the Aged is at the Belmont Avenue address, and the Motherhouse for Deaconesses at 801 Merion Square Road. Both are in Lower Merion Township.

For many years, Drexel Home was closely associated with the Lankenau Hospital. Both were founded by John P. Lankenau. The Lankenau Hospital was incorporated on April 12, 1860, originally under the name of "The German Hospital of the City of Philadelphia", which was later changed, on February 4, 1919, to "The Lankenau Hospital".

Shortly after the Lankenau Hospital was chartered, John D. Lankenau realized the need for excellent nursing care for the patients of the hospital, and invited seven deaconesses to come from Germany to Philadelphia to take charge of the nursing care in the hospital. Subsequently realizing the need for a home for these deaconesses, Mr. Lankenau constructed a beautiful, large building on grounds leased from "The German Hospital", to serve as a deaconess motherhouse. It was at this time that the Drexel Home came into being and was incorporated. Mr. Lankenau paid for the construction of the building to be given to the home, and for the leasing of a portion of the property owned by the German Hospital for use of the motherhouse.

Lankenau Hospital and Drexel Home for many years operated, coöperated and functioned not only in close proximity to each other, but also in harmony and intimate association. By agreement of March 21, 1899, the Lankenau Hospital and Drexel Home covenanted to continue the operations of the two institutions "in a spirit of fraternal union, generously coöperating with each other in the upbuilding, maintenance and advancement of the objects of the said institutions". Their charter functions, however, remained separate and distinct. Lankenau Hospital was incorporated for the purpose of operating and maintaining a hospital, whereas Drexel Home was incorporated to establish, maintain and manage (1) a home for aged couples; and (2) a home and motherhouse for the maintenance,

religious instruction and education of teachers; and (3) a hospital for children and a high school for girls. The bylaws of the hospital provided that three of the trustees of the Lankenau Hospital would at all times be members of the Board of Trustees of the Drexel Home.

The operation of the Drexel Home for the aged and the training of the deaconesses and the operation of the high school for girls was, indeed, foreign to the purposes and operations of the Lankenau Hospital. However, with regard to the Children's Hospital, which was conducted by the home as a separate entity, members of the medical and surgical staff of the Children's Hospital also served on the hospital staff of Lankenau Hospital.

Sometime in 1952, Lankenau Hospital's facilities had become antiquated and the hospital was confronted with the decision either to spend a large sum rebuilding and reëquiping the old hospital or building an entirely new hospital. Lankenau Hospital decided on the latter course, sold its premises and moved to Montgomery County. As a result of this decision, after August 13, 1952, the continuation of Children's Hospital by the Drexel Home was rendered impossible. The Drexel Home is not now operating a children's hospital, and the discontinuance of this service gives rise to the present petition.

The Children's Hospital Fund, $9,878.22, plus accrued income, is composed of testamentary gifts of varying amounts from five different estates. A list of these bequests indicating the name of the donor and the amount of the bequest appears in exhibit "C" appended to the petition of the Drexel Home. Certified copies of the wills of four of the donors were submitted in evidence. The will of the fifth testator was not submitted, the gift amounting to only $93. All four of the wills were probated in Philadelphia Coun-

ty. One testatrix (Emily L. Heyer) appears to be a resident of New Jersey.

The Orphans' Court Act of August 10, 1951, P. L. 1163, sec. 301(2) states:

"The orphans' court shall have exclusive jurisdiction of: . . . (2) The administration and distribution of the real and personal property of testamentary trusts whether created before or after the effective date of this act . . .".

Therefore, if it is ultimately determined that the various wills of the above four testators created charitable testamentary trusts, orphans' courts have jurisdiction over the administration of these trusts. If, on the other hand, it is concluded that no trusts exist, then, of course, the orphans' courts would not have jurisdiction of this matter.

Section 306 of the Orphans' Court Act concerns venue of trust estates and reads:

"When a Pennsylvania orphans' court has jurisdiction of any trust, testamentary or *inter vivos*, except as otherwise provided by law, the venue for all purposes shall be in the county where at the time being is the situs of the trust. The situs of the trust shall remain in the county of the court which first assumed jurisdiction of the trust, unless and until such court shall order a change of situs under the provisions of this act."

On the subject of situs of testamentary trusts, section 307 of the same act states:

"The situs of a testamentary trust shall be in the county where letters were granted to the personal representative, and in the absence of such letters, then in the county where such letters could have been granted, and if no such letters could have been granted, then in a county in which any trustee resides or is located."

Thus, it is clear that if the Children's Hospital Fund is held in trust, the situs of this trust is Philadelphia County, and the court having jurisdiction is the Philadelphia County Orphans' Court. A formal accounting, followed by an adjudication of the orphans' court, was filed in the three estates in which decedents were residents of Philadelphia. The terms of the awards contained in these adjudications constitute a determination of whether these bequests are held in trust. Thus, the question of whether these funds are held in trust, and if so, what disposition should be made of them at this time is a matter for decision by the Orphans' Court of Philadelphia and not this court. See Miller Trust, 7 Fiduc. Rep. 425. We therefore decline to rule on the prayer of the Drexel Home's petition as it applies to the Children's Hospital Fund.

The Free Bed Fund of $105,293.75, plus accrued income, is composed of both testamentary and inter vivos gifts made over a period of years from 1891 to 1950. The only comprehensive record of the source of these gifts is the minutes of the Board of Trustees of the Drexel Home. A list of the donors is also contained in a memorial plaque formerly displayed in the Children's Hospital. Excerpts from the minutes pertaining to the Free Bed Fund appear in exhibit "B" of the Drexel Home's petition, and from these minutes it appears that the testamentary gifts total $38,001.75, consisting of $23,001.75 from the Estate of Theresa G. Kinike, $5,000 from the Estate of Eva Miller, $5,000 from the Estate of Theodore C. Birnbaum, and $5,000 from the Estate of Ottilie Pohl. Copies of the wills of decedents Kinike, Miller and Birnbaum were offered into evidence and all were probated in Philadelphia County. The Pohl will was not available, but the testimony establishes that this decedent was a resident of Philadelphia County at the time of her death. Therefore, as in the case of the testamentary gifts to the

Children's Hospital Fund, if these funds are held in trust, proper venue for matters concerning these testamentary trusts is Philadelphia County, not Montgomery County. If the funds are not in fact held in trust, then, of course, neither the Philadelphia nor Montgomery County Orphans' Court has jurisdiction over these funds. Therefore, we also decline to rule on the prayer of the Drexel Home as it applies to this $38,001.75 and the fractional portion of accumulated income pertaining to this fund.

The balance remaining in the Free Bed Fund, after deducting the above testamentary bequests, was contributed by numerous donors as inter vivos gifts. Whether or not the funds represented by the inter vivos gifts are now held in trust is solely a matter of the intention of the fourteen or more donors. Although it is difficult to acertain the composite intent of these donors, after a careful examination of the record, I conclude that these people did intend that their money should be held in trust by the Drexel Home for the purpose of providing hospital care for children in their Children's Hospital. The evidence concerning the bulk of the gifts is confined to notations in the minutes of the Board of Trustees of the Drexel Home alluded to above. These notations are very brief and are usually to the effect that $5,000 has been received from a particular donor "to the Children's Hospital", or "to endow a free bed at the Children's Hospital", or simply "for a free bed in the Children's Hospital". In addition to this record, a typical solicitation card dated 1934, used by the Friends of Children, a women's organization dedicated to raising funds for the Children's Hospital gives an accurate indication of the intent of more modern donors. The text of the card and of a letter accompanying the gift from one of the donors which was introduced

into evidence appears below in the footnotes,[1,2] and clearly indicates that this particular donor intended her donation to be used to endow a free bed for children in the Children's Hospital.

Finally, and of prime importance, some intent must be ascribed to the fact that all of these gifts were made to the Free Bed Fund of the Children's Hospital. This is the label affixed to the gifts by the donors themselves. An intention is implicit in the gift of a donor to this particular fund that his gift be held in trust to be used solely for the purposes of this specific area of the corporate function of the Drexel Home, namely, for operating a hospital for children. The sit-

---

[1] For Children's Hospital of The Mary J. Drexel Home
2100 South College Avenue,
Philadelphia, Pa.

Nov. 7th 1934

Enclosed find $5000.00 to endow a free bed   my contribution to the Hospital in response to

CHILDREN'S HOSPITAL DAY APPEAL

Name   (Miss) Margaret I. Vaughan
Address   203 Bank Ave., Riverton, N. J.

Make check payable to Mrs. Edmund Funck, Financial Secretary, Friends of Children. Mail it to 2100 South College Avenue, or hand it to any member of the Committee.

$5,000 ENDOWS A FREE BED.

---

[2] M. I. Vaughan
203 Bank Avenue
Riverton, N. J.

Nov. 7th 1934

Mrs. Edmund Funck,
160 W. Luray St.,
Olney, Phila., Pa.
My dear Mrs. Funck—

Attached you will find a check with which I would like to endow a free bed in memory of my father and mother, Mr. and Mrs. David F. Vaughan.

Sincerely,
MARGARET I. VAUGHAN.

uation is similar to that in Craig Estate, 356 Pa. 564, where the court noted, at page 568:

"If this testatrix's gift had been to a trustee other than the church itself, it is clear we would be bound to sustain the trust in the hands of such trustee and refuse any request by the church or its successor for the possession of the assets. . . .

"The testatrix did not create an active trust of this nature, but gave the fund directly to the church corporation with the direction, however, that it be retained as a permanent fund to be separately invested and the money used for the care of the church and church property."

The court at page 567 stated the law to be as follows:

"Where a gift is made directly to a charitable or religious body for purposes which are within the powers of the corporation, it is a trustee for itself, and holds for the purposes specified in the gift. It is, however, a trust in the sense that the fund does not merge into the general property of the corporation but remains under the jurisdiction of a court of Equity."

I conclude, therefore, that from all the facts and circumstances surrounding these gifts that the donors intended and did create a valid inter vivos charitable trust.

As opposed to the testamentary gifts, the situs of the trust created by these inter vivos gifts is Montgomery County, and this court, therefore, is the proper venue for consideration of the petition of the Drexel Home.

The Orphans' Court Act of 1951, sec. 308(b)(1) provides:

"If the trust instrument does not expressly provide for the situs of the *inter vivos* trust, its situs shall be: In the case of an *inter vivos* trust whose settlor is domiciled in the Commonwealth . . . (ii) after the set-

tlor's death, either in the county in which letters have been granted to his personal representative, or in a county in which letters could have been granted, or in a county in which any trustee resides or is located."

In addition, it is clear that the orphans' courts have jurisdiction of the administration of inter vivos trusts: Orphans' Court Act of 1951, sec. 301(3).

It has been established that the Drexel Home has discontinued operation of its Children's Hospital, and is no longer providing hospital care for children. The application of the doctrine of cy pres is necessary, therefore, to insure a continuation of the charitable purpose of this trust. Section 10 of the Estates Act of April 24, 1947, P. L. 100, states:

"Except as otherwise provided by the conveyor, if the charitable purpose for which an interest shall be conveyed shall be or become indefinite or impossible or impractical of fulfillment, or if it shall not have been carried out for want of a trustee or because of the failure of the trustee to designate such purpose, the court may, on application of the trustee or of any interested person or of the Attorney General of the Commonwealth, after proof of notice to the Attorney General of the Commonwealth when he is not petitioner, order an administration or distribution of the estate for a charitable purpose in a manner as nearly as possible to fulfill the intention of the conveyor, whether his charitable intent be general or specific,"

The evidence clearly supports the allegation that Lankenau Hospital is now conducting a children's hospital, or more accurately, a pediatrics department in its hospital which concedely performs all the functions formerly conducted by the Children's Hospital as operated by the Drexel Home. The Lankenau Hospital has taken over the operation of the Children's Hospital from the Drexel Home and has established a pediatrics department in the new hospital which is

designated as the "Mary J. Drexel Pediatrics Department". All of the patients were physically transferred from the Children's Hospital to Lankenau, as were all the records and some of the equipment of the Children's Hospital. Members of the medical staff of the Children's Hospital, who were not theretofore members of the staff of Lankenau, became members of the medical staff of Lankenau Hospital. The hospital in the Drexel Home had 45 beds; the Mary J. Drexel Pediatrics Department of Lankenau Hospital has 44 beds.

The evidence also establishes that a ladies' auxiliary, known as The Friends of Children, supported the work of the Children's Hospital, and was most active, not only in raising funds for current expenses, but also in soliciting gifts for the Free Bed Fund. The Friends of Children is now continuing its activities in support of the pediatrics department of Lankenau.

After full and careful consideration of all the evidence, I conclude that the Mary J. Drexel Pediatrics Department of the Lankenau Hospital is a continuation of the same work by essentially the same group of people in the care and treatment of children and that the intention of the donors would be more closely approximated and carried out if such funds are awarded to the Lankenau Hospital for the use of its pediatrics department known as the Mary J. Drexel Pediatrics Department of the Lankenau Hospital. I therefore award the balance of the funds comprising the Free Bed Fund (after deduction of the $38,001.75 mentioned above) plus the fractional portion of accumulated income of this share, to the Lankenau Hospital to be held in trust for the purpose of providing hospital care for children in its pediatrics department known as the Mary J. Drexel Pediatrics Department of the Lankenau Hospital.

Done this 19th day of July 1957.